Eric John Meisner
Prison Number 82318-008
Fort Dix Prison
Postr Office Box 2000
Fort Dix, New Jersey, 08640
**Pro-Se Prisoner Plaintiff**

☑ FILED ___ LODGED
___ RECEIVED ___ COPY

MAR 2 3 2009

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY_____ B DEPUTY

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

|  |  |
|---|---|
| ERIC JOHN MEISNER, | ) |
| Pro-Se Prisoner Plaintiff, | ) |
| vs. | ) |
| ANDERS ROSENQUIST, ROSENQUIST & ASSOCIATES, | ) |
| Defendants. | ) |

JURY TRIAL DEMANDED

CV 09-8048 -PCT-D6C - ECV

Civil Action No. _____

Judge David G. Campbell

Related Party Action In
Criminal Case:
USA v MEISNER
Case No. 04-CR-01073-DCG

## COMPLAINT

## SHORT INTRODUCTION TO THE INSTANT CONTROVERSY

1.    The Plaintiff is held in Federal detention caused by the malpractice, joined by fraud and deceit of Anders Rosenquist, an alleged attorney, hereinafter, ("Defendant").

2.    On or about March 10, 2008, Defendant attorney Rosenquist was appointed under the Criminal Justice Act 18 U.S.C.§3006 to represent the Plaintiff who was ordered In Forma Pauperis standing under 28 U.S.C. § 1915 by the United States Court Of Appeals For The Ninth Circuit in USA v MEISNER 9th Cir. Case No. 07-10008.

3.    Plaintiff will show below that subject matter jurisdiction is invoked under 28 U.S.C.§1331, A Federal Question, joined with 28 U.S.C.§1332, Diversity Of Citizenship, whereby the Plaintiff is a resident of the State of New Jersey, residing at 224 Gibbs Ave, Hamilton, New Jersey, 08611 and the Defendant is a resident of the State of Arizona, whereby his office is located at 80 E. Columbus, Phoenix, Arizona, 85012, whereby the Plaintiff at all times of this Complaint was held in the State of New Jersey at Fort Dix Prison.

4.    Well settled Federal Law establishes that the Plaintiff's residence under the issue of Diversity 28 U.S.C. § 1332 is set forth by the residence of the Plaintiff before entering into Federal incarceration. Therein, the Plaintiff's only residence prior to Federal incarceration was at 224 Gibbs Avenue, Hamilton,

New Jersey, 08611.

5.      Defendant's acts that are alleged in the instant
Complaint took place, in the State of Arizona and by
wire and mail, telephonic and other methods of com-
munications with the Plaintiff from the Defendant's
location at 80 E. Columbus, Phoenix, Arizona, 85012.

6.      The action is filed for $10 million in compensatory
damages joined with $10 Million of punitive damages
caused by the Defendant's wanton malice, fraud and
deceit, joined by malpractice, causing massive prejudice
in the plaintiff's failure to be released under Federal
Appellate Rule 9(b) from Federal Prison based upon
Federal Criminal Rule 52(b), Plain Error. **USA v OLANO,
123 L. Ed. 2d 508 (1993)** within the Plaintiff's pending
appeal **USA v MEISNER** Case No. 07-10008.

7.      In addition, the Plaintiff will show below, the
specific acts of wanton malice, fraud and deceit, joined
by malpractice by the Defendant in the failure to prepare
for the filing of the Plaintiff's Direct Appeal in the
U.S. Court Of Appeals For The Ninth Circuit in **USA v
MEISNER** Case No. 07-10008.

8.      In furtherance of the above charging paragraph
against the Defendant, the Plaintiff will show below
with particularity, the Defendant's wanton malice, fraud
and deceit, joined with malpractice by filing the
Defendant's fraudulent Direct Appeal in **USA v MEISNER**

**Case No. 07-10008** on or about March 17, 2008 in The
United States Court Of Appeals For The Ninth Circuit.

9.        Plaintiff will show below that the Lower Court
record in USA v MEISNER Case No. 04-CR-01073-DCG estab-
lishes with particularity, Plain Error, Clear Error,
under Federal Criminal Rule 52(b) USA v OLANO, supra,
whereby said Lower Court record shows Prima Facia
evidence establishing serious Constitutional violations
that have been holding the Plaintiff Unconstitutionally
in Federal custody from March 10, 2008 at the direct
cause of the Defendant. USA v DOMINGUEZ-BENITEZ, 159 L.Ed.
2d 157 further distinguishing Plain Error, under Federal
Criminal Rule 52(b).

10.       Plaintiff alleges that the Defendant is the cause
of all of his prejudice and damages from March 10, 2008
ongoing by the Defendant's continuous acts of fraud and
deceit joined by malpractice as established below.

### JURISDICTION AND VENUE

11.       Plaintiff invokes subject matter jurisdiction under
28 U.S.C. § 1331, Federal Question, whereby the Defendant
was appointed under the Criminal Justice Act 28 U.S.C. §
3006 caused by the Appeals Court ordering that the
Plaintiff was In Forma Pauperis 28 U.S.C. § 1915 on
February 2, 2007 in USA v MEISNER Case No. 07-10008, (9th
Cir. 2007).

12.       Plaintiff's Federal question allegations below shows

the Defendant's wanton malice, fraud and deceit, joined
by malpractice under the appointment of The United States
Court Of Appeals For The Ninth Circuit, pursuant to the
Criminal Justice Act. 18 U.S.C. § 3006 joined with The
Ninth Circuit's Order on February 2, 2007 ruling that the
Plaintiff was In Forma Pauperis 28 U.S.C. § 1915. Therein,
the instant Complaint shows continuous allegations under
Federal question of law pursuant to 28 U.S.C. § 1331.

### PLAINTIFF'S ADDITIONAL JURISDICTION UNDER DIVERSITY OF CITIZENSHIP BETWEEN PLAINTIFF AND DEFENDANT PURSUANT TO 28 U.S.C. § 1332

13.     Plaintiff alleges that he was a citizen of the State
of New Jersey, residing at 224 Gibbs Avenue, Hamilton,
New Jersey, 08611 before Federal incarceration whereby
well settled federal law establishes that the Plaintiff's
pre-incarceration domicile is the basis for diversity of
citizenship pursuant to 28 U.S.C. § 1332, whereby the
Defendant has been continuously domiciled from the start
of his misconduct on or about March 10, 2008 at 80 E.
Columbus, Phoenix, Arizona, 85012.

14.     The instant action is filed for $10 Million in comp-
ensatory damages, along with $10 Million in punitive
damages.

### VENUE

15.     Plaintiff invokes venue in the District Court whereby
all the acts of the Defendant took place within the dist-
rict of this United States District Court whereby the

Defendant acted from 80 e. Columbus, Phoenix, Arizona, 85012.

## FACTUAL ALLEGATIONS

16.    Plaintiff alleges that the instant action is joined with his pending criminal case appeal in **USA v MEISNER**, **Case No. 07-10008**, United States Court Of Appeals For The Ninth Circuit, 2009.

17.    Plaintiff alleges that well settled Federal law requires the filing of the instant action against the Defendant under collateral attack in the Plaintiff's pending Direct Appeal **USA v MEISNER, supra**.

18.    Plaintiff alleges that this Honorable Court may seek to stay the instant action until the Plaintiff's pending Direct Appeal Case No. 07-10008 or any other post conviction litigations are settled.

19.    Plaintiff alleges that the Defendant's actions started on or about March 10, 2008 in causing continuous ongoing serious injury in the Plaintiff's pending Appeal Case No. 07-10008.

## FRAUD AND DECEIT JOINED BY MALPRACTICE BY THE DEFENDANT IN APPEAL NO. 07-10008

20.    Plaintiff alleges that on or about March 10, 2008 The Ninth Circuit appointed the Defendant to assist the plaintiff in Direct Appeal Case No. 07-10008.

21.    Plaintiff alleges said above appointment of the Defendant was made by The Ninth Circuit under Criminal Justice Act 18 U.S.C. § 3006, whereby The Ninth Circuit

ordered that the Plaintiff was In Forma Pauperis under 28
U.S.C. § 1915 on February 2, 2007.

22.    Plaintiff alleges that the Defendant is the sixth
attorney acting in the Plaintiff's criminal proceeding
that started in USA v MEISNER, 04-CR-01073-DCG in Sept-
ember, 2004.

23.    Plaintiff alleges that the Defendant acted by fraud
and deceit joined by malpractice whereby on or about June
10, 2008, the Defendant was directed in the plaintiff's
retention by The Ninth Circuit in the above criminal
Appeal to seek and gather all of the attorney work
product from the Plaintiff's five prior attorneys in the
above District Court criminal proceeding and Appeals
proceedings that the Plaintiff participated in.

24.    Plaintiff alleges specific written communications
with the Defendant on March26, 2008, April 11, 2008,
May 17, 2008 and July 11, 2008.

25.    Plaintiff alleges that the Defendant acted by fraud
and deceit joined by malpractice under the March 26,2008,
April 11, 2008, May 17, 2008 and July 11, 2008 written
communications that the Plaintiff filed with the
Defendant by Certified Mail, Return Receipt Requested,
that were all received by the Defendant.

**PLAINTIFF'S MARCH 26, 2008 WRITING TO THE DEFENDANT
WHEREBY THE DEFENDANT ACTED BY FRAUD AND DECEIT
JOINED BY MALPRACTICE WITH THE MARCH 26, 2008
PLAINTIFF'S LETTER OF DIRECTION SHOWING PLAIN
ERROR IN THE LOWER COURT RECORD UNDER
FEDERAL CRIMINAL RULE 52(b)**

26.     On March 19, 2008, the Defendant issued his written communication to the Plaintiff that attached the Defendant's March 13, 2008 Notice To The Court Regarding Briefing in the Plaintiff's Direct Appeal Case No.07-10008.

27.     Plaintiff alleges that the March 19, 2008 letter from the Defendant that attached the Defendant's March 13, 2008 Direct Appeal Filing shows <u>Prima Facia</u> fraud and deceit joined by malpractice under the Plaintiff's Lower Court criminal record that shows Plain error in accordance with Federal Rule 52(b) <u>USA v OLANO</u>,**supra.**

28.     Plaintiff alleges the above two fraudulent documents issued by the Defendant shows a fraud on the Court in the Defendant's March 13, 2008 Notice To The Court Regarding Briefing in the Plaintiff's then pending Direct Appeal Case No. 07-10008.

29.     Plaintiff alleges the Defendant's fraud on the Court in the above March 13, 2008 filing that conceals the Plain Error criminal Federal Rule 52(b) whereby Judge Campbell asked the Plaintiff on December 11, at the 2006 Sentencing Proceeding at pages 7 & 8 in the District Court criminal case record if the Plaintiff received his copy of his Expert Stuart Allen Report before the Plaintiff entered his Unconstitutional Guilty Plea.

30.      Plaintiff alleges that the Defendant understood by his representation made in The Ninth Circuit Court Of Appeals in his March 13, 2008 filing that the Plaintiff did not receive the Expert Stuart Allen Report before he entered into the unconstitutional Guilty Plea.

31.      Plaintiff alleges the Defendant's fraud and deceit joined by malpractice in failing to quote the Judge Campbell question in the December 11, 2006 Lower Court criminal proceeding at pages 7 & 8  asking the Plaintiff if he had received his Expert Stuart allen Report before the Plaintiff's Unconstitutional Guilty Plea. Said plea would never have been entered if the Plaintiff was pro- vided with his Expert Stuart Allen Report before his Lower Court counsel had the plaintiff file his involuntary and unintelligent Guilty Plea. Said plea is in direct conflict with his Expert's Stuart allen Report showing that the Plaintiff could not be guilty pursuant to factual innocence at both the Suppression Hearing and the Guilty Plea proceedings.

32.      Plaintiff alleges that in furtherance of the above paragraph allegation against the Defendant, the Lower Court criminal proceeding record made by A.U.S.A. Mary Beth Pfister at pages 30 through 33 further questions the plain Error of Plaintiff's claim whereby the failure by the defense counsel Manno, in not turning over the Plaintiff's Expert Stuart Allen Report to Plaintiff

until August 18, 2006, after the Unconstitutional, involuntary, and unknowing Guilty Plea shows this Defendant Rosenquist filed his fraud on the Appeals Court March 13, 2008, Notice To Court Regarding Briefing in the Plaintiff's Direct Appeal that conceals all of the lower Court record regarding the Plaintiff's Expert Stuart Allen Report that was the subject of Judge Campbell's sentencing questioning in the criminal case Lower Court record pages 7 through 9 and 30 through 33.

33.        Plaintiff alleges that the March 13, 2008 fraud on the Appellate Court filing by Defendant conceals the Plaintiff's substantial rights violations under Federal Criminal Rule 52(b) regarding the Lower Court record showing Manno's Supplemental Memorandum in Support Of Motion To Suppress, as the Plaintiff proved that the stop of the Plaintiff's vehicle had substantially fraudulent acts by Officer Craft who performed the stop that was the grounds for the plaintiff's Unconstitutional arrest. This was established in the Lower Court record, based upon Manno's Supplemental Memorandum In Support Of Motion To Suppress, filed 8/25/05. (Jdge. Campbell Dkt.46 hereinafter EXHIBIT ONE, Jdge. Campbell Dkt.74 hereinafter EXHIBIT FOUR, Order Denying Motion To Suppress.)

34.        Plaintiff alleges that his criminal case Lower Court Docket #46, dated August 25, 2008, that was defense counsel Donald Manno's Supplemental Memorandum in Support Of Motion To Suppress well established that the speed limit highway sign showing 55MPH was a Plain Error whereby

-9-

the sign was posted in the confirmed 65MPH location.

35.        Plaintiff alleges that the Defendant's fraud on the Court in the March 13, 2008 Appellate filing conceals the Plaintiff's substantial rights violation that is well established on the Lower Court criminal case record at the Suppression Hearing joined with the Sentencing Proceeding whereby the criminal case Lower Court Docket #46 dated August 25, 2008 that was the defense counsel Donald Manno Supplemental Memorandum In Support Of Motion To Suppress showed *Prima Facia* evidence of no reasonable suspicion or probable cause for Officer Craft to have stopped the Plaintiff's vehicle when Officer Craft confirmed that Plaintiff was traveling at 62MPH. Therein, the Plaintiff was stopped at a 65MPH speed zone at mile marker 339 Northbound Interstate 17 that made the Officer Craft stop Unconstitutional under Plain Error Federal Criminal Rule 52(b).

**PLAIN ERROR FEDERAL CRIMINAL RULE 52(b) FRAUD AND DECEIT MALPRACTICE JOINED BY FRAUD ON THE COURT BY THE DEFENDANT IN HIS MARCH 19, 2008 APPELLANT'S COURT DOCKET #59 REFILING THE MAY 29, 2007 ATTORNEY PHILIP HANTEL FRAUDULENT APPELLANT BRIEF THAT CONCEALS THE PLAINTIFF'S SUBSTANTIAL RIGHTS VIOLATIONS IN THE LOWER COURT CRIMINAL RECORD UNDER THE AUGUST 25, 2005 DONALD MANNO DEFENSE COUNSEL SUPPLEMENTAL MEMORANDUM IN SUPPORT OF MOTION TO SUPPRESS IN CASE NO. 04-CR-1073-DCG (SEE JUDGE CAMPBELL DOCKET # 46)**

36.        Plaintiff alleges that he specifically filed his written communications by Certified Mail Return Receipt Requested with the Defendant on March 26, 2008, April 11,

-10-

2008, May 17, 2008, and July 11, 2008 whereby the Defen-
dant defrauded the Plaintiff by fraud on the Court in
filing the Defendant's March 19, 2008 refiled Brief of
the Appellant counsel Philip Hantel filed May 29, 2005
brief that conceals the entire lower Court record in the
August 25, 2005 Donald Manno defense counsel Supplemental
Memorandum and Court Order. (EXHIBITS ONE & FOUR respectively)

37.      Plaintiff alleges that the Defendant on March 13,
2008 filed in the Appeals Court Notice To Court Regarding
Briefing at page 2 of said filing by the Defendant in
his "Wherefore" clause the Defendant stated that he would
make his own filing in the Plaintiff's pending Direct
Appeal whereby the Defendant was responsible for review-
ing the Lower Court criminal record.

38.      Plaintiff alleges that the Defendant acted by fraud
and deceit joined by malpractice and fraud on the Court
by concealing from his March 13 and March 19, 2008
Plaintiff's Direct Appeal filings the Plain Error sub-
stantial rights violations under Federal Criminal Rule
52(b) that was set forth in the August 25, 2005 defense
counsel Donald Manno Supplemental Memorandum In Support
Of Motion To Suppress in the Lower Court criminal case
04-CR-01073-DCG, which established that the plaintiff was
stopped by Officer Craft on Interstate 17 Northbound
at highway mile marker 339 that was confirmed by the
**http://www.arizonaroads.com/interstate/i17.html** website,

EXHIBIT ONE, attached hereto, to be a 65MPH speed zone, whereby the plaintiff was only traveling 62MPH in accordance with EXHIBIT TWO attached hereto, the defense counsel Donald Manno August 25, 2005 Lower Court above quoted Memorandum in the Plaintiff's Motio To Suppress. (See EXHIBIT ONE, EXHIBIT TWO and EXHIBIT FOUR attached hereto).

39.     Plaintiff alleges that the Defendant acted by fraud on the Court in his March 13 and 19, 2008 Direct Appeal filings by concealing the Plaintiff's Lower Court record that established that the Plaintiff was traveling at 62 MPH confirmed by Officer Craft stopping the plaintiff on September 6, 2004, when **http://www.arizonaroads.com/ interstate/i17.html** website confirmed in EXHIBIT ONE that Officer Craft stopped the Plaintiff Unconstitutionally at a 65MPH zone at mile marker 339 Northbound on Interstate 17. (See EXHIBIT ONE and EXHIBIT FOUR attached).

40.     Plaintiff alleges that the Defendant acted by fraud and deceit and malpractice in concealing from his March 13 and 19, 2008 Appellate Court Direct Appeal filings that the lower Court Suppression Hearing was Constitutionally deficient in ruling under direct conflict with the Plain Error evidence showing that the Officer Craft September 6, 2004 stop of the Plaintiff was at mile marker 339, that was confirmed to be a 65MPH speed zone whereby Officer Craft confirmed at the September 6, 2004 stop that the Plaintiff was traveling at 62MPH that was

under the 65MPH speed limit established in EXHIBIT ONE
and in EXHIBIT FOUR, both attached hereto.

41.   Plaintiff alleges that the Defendant concealed in his
March 13, and 19, 2008 Direct Appeal filings the Prima
Facia Constitutional substantial rights violations that
well established on September 6, 2004, the day that
Officer Craft stopped the plaintiff, that there was no
reasonable suspicion for said stop.(EXHIBITS ONE & FOUR).

**DEFENDANT'S ONGOING FRAUD AND DECEIT JOINED BY ACTS OF
MALPRACTICE AND MAIL FRAUD WITH HIS FRAUD ON THE COURT
BY FILING DEFICIENT DIRECT APPEAL PAPERS ON MARCH 13 &
19, 2008 AND OCTOBER 15, 2008 THAT CONCEALS PLAINTIFF'S
PLAIN ERROR CRIMINAL RULE 52(b) SUBSTANTIAL RIGHTS
PREJUDICE IN THE JUDGE CAMPBELL WELL ESTABLISHED
RECORD AT THE SUPPRESSION HEARING, THE GUILTY
PLEA, WITHDRAWL OF GUILTY PLEA AND SENTENCING
PROCEEDINGS**

42.     Plaintiff issued his March 26, April 11, May 17, and
July 11, 2008 written distinguished claims that was well
established on the Lower Court record in front of Judge
Campbell whereby Defendant received the above discerned
evidence under Certified Mail, return receipt Requested.

43.     Plaintiff alleges the Defendant acted as established
in the above heading with the Defendant's March 13 and
19, 2008 filings that misstated and concealed the
Plaintiff's Suppression Hearing, withdrawn guilty plea,
guilty plea and Sentencing proceeding that were uncon-
stitutional by error that prejudiced the Plaintiff's
substantial rights under Federal Criminal Rule 52(b).
OLANO, 507 U.S. at 734-735, 113 S.Ct. 1770.

44.     Plaintiff alleges under the above established head-
ing that the Defendant's March 13 and 19, 2008 and Oct-
ober 15, 2008 filings were Constitutionally deficient
by concealing the Plaintiff's Judge Campbell Docket #46
supplemental Suppression Hearing filing that showed it
was impossible for the Plaintiff to be speeding on Sept-
ember 6, 2004 wherein Officer Craft provided Suppression
Hearing testimony establishing that the Plaintiff was
traveling at 62MPH whereby the evidence established by
**http://www.arizonaroads.com/interstate/i17.html** proved
the mile marker 339 Northbound on Interstate 17 was a
65MPH speed limit. (See EXHIBITS ONE & FOUR attached).

45.     Plaintiff alleges all of the above charges in the
heading before paragraph 42 against the Defendant
wherein the Defendant never reviewed Docket #46 in the
Judge Campbell Lower Court proceeding that well estab-
lished the plaintiff's Federal Criminal Rule 52(b)
substantial rights violations, whereby Officer Craft's
Suppression testimony confirmed there was no reasonable
suspicion or probable cause to stop the Plaintiff when he
was traveling at 62MPH in the established 65MPH speed limit
in EXHIBITS ONE & FOUR, Lower Court Dockets #46 & 74.

46.     Plaintiff alleges under the above heading before
paragraph 42 that the Defendant acted with wanton malice
and mail fraud in concealing the Plaintiff's well estab-
lished Federal Criminal Rule 52(b) substantial

rights violations that were mandatory for the Defendant
to invoke in his March 13 and 19, and October 15, 2008
Direct Appeal filings that proved the Plaintiff was not
speeding and that the Plaintiff's Expert Stuart Allen
Report, EXHIBIT THREE, attached hereto, well established
substantial rights violations on the Officer Craft
videotape of the crime scene that was introduced on the
Lower Court record.

47.     Plaintiff alleges under the above heading before
paragraph 42 that the Defendant fully understood that
he deprived the Plaintiff of his substantial rights
in the Defendant's March 13 and 19, 2008 and October
15, 2008 Direct Appeal filings that concealed the
Plaintiff's claims in EXHIBIT ONE, showing Officer
Craft had no reasonable suspicion or probable cause
to stop the Plaintiff for speeding, in addition to the
Plaintiff's Expert Stuart Allen Report, EXHIBIT THREE,
attached hereto, that well established hundreds of
anomalies within the crime scene Officer Craft video-
tape, whereby all of the foregoing was in the Plaintiff's
March 26, April 11, May 17, and July 11, 2008 written
communications by the Plaintiff to the Defendant.

48.     Plaintiff alleges all the charges against the
Defendant in the heading above paragraph 42 whereby
the Defendant caused extraordinary prejudice harming
the Plaintiff's Direct Appeal on March 19, 2008 by

refiling the Court's prior CJA attorney Philip Hantel's
Constitutionally deficient May 29, 2007 brief.

49.      Plaintiff alleges all of the charges against the
Defendant set forth in the heading above paragraph 42
whereby the Defendant operated a billing and a mail
fraud in seeking fees on behalf of the Plaintiff for
legal assistance that the Defendant never provided to
the Plaintiff in preparation and filing of the
Defendant's March 13 and 19, 2008 and October 15, 2008
Constitutionally deficient Direct Appeal papers.

MALPRACTICE PLAIN ERROR FEDERAL CRIMINAL RULE 52(b)
BY DEFENDANT WHO CONCEALED FROM THE APPEALS COURT
THE PLAINTIFF'S SUPPLEMENTAL MEMORANDUM IN SUPPORT
OF MOTION TO SUPPRESS DATED AUGUST 25, 2005 THAT
PROVED THE PLAINTIFF WAS NOT SPEEDING THEREIN
SHOWING THE OFFICER CRAFT STOP OF THE
PLAINTIFF TO BE UNCONSTITUTIONAL

50.      Defendant ignored the above issue that is a Dead-
Bang-Winner and chose to file a Slam-Dunk-Loser that
had been filed before by the fired former appointed
counsel, Philip Hantel.

51.      <u>United States v. Cook</u>, 45 F.3d 383 (10th Cir. 1995)
established the above legal term, Dead-Bang-Winner.

52.      Defendant concealed in his Appeal filing the above
Supplemental Memorandum in the Motion To Suppress that
showed Plain Error Federal Criminal Rule 52(b) <u>Olano v.
U.S.</u>, 123 L.Ed.2d 508 (1993) that would have made the
Suppression Hearing in the Lower Court Ruling showing
the Unconstitutional Officer Craft stop.

53.     Defendant concealed the above claim from the brief
        that he filed for the Appellant that had to be presented
        to the Appeals Court under Supreme Court mandate whereby
        said claims are clearly a stronger issue that the Defend-
        ant filed in the Appellant's brief.

54.     Defendant concealed from the Unconstitutional brief
        he filed in the Appeals Court that the above heading
        showing a Plain Error Federal Criminal Rule 52(b) in the
        Lower Court for not sufficiently permitting the review of
        the Unconstitutional 55 MPH posting speed limit that
        fraudulently misrepresented the actual 65MPH speed zone
        that was available to the Defendant within the Lower
        Court record.

55.     Defendant concealed from his Unconstitutional filed
        Appeal Brief the Plain Error Federal Criminal Rule 52(b)
        acted out by the Lower Court Defense Counsel, Donald
        Manno, by withholding the mandatory argument in the above
        heading from Judge Campbell at the Suppression hearing.

56.     Defendant Unconstitutionally deprived the Plaintiff
        from filing his mandatory Bail Release Motion that was
        based on the substantial crimes established in this
        Complaint, including the above heading in the Suppression
        Hearing.

## LIBERAL INTERPRETATION BY THE COURT SHOULD BE PROVIDED WHEN REVIEWING THE PRO-SE PRISONER PLAINTIFF'S INSTANT LITIGATION FILING

57.     Plaintiff alleges mail and billing fraud by the Defendant when the Defendant filed his October 15, 2008 Motion To Withdraw As counsel For The Plaintiff in addition to the Defendant's CJA billing authorizations on behalf of the Plaintiff to the Court in the Plaintiff's Direct Appeal filings.

58.     Well settled law establishes that this Court should review the instant litigation under a sympathetic liberal interpretation that is provided to <u>Pro-Se</u> litigants.

## THIS COURT'S SERVICE UPON THE DEFENDANT IS REQUIRED UNDER THE PLAINTIFF'S FORMA PAUPERIS STANDING 28 U.S.C. § 1915 JOINED WITH 18 U.S.C. § 3006

59.     The above Federal Statutes require this Court to perfect service upon the Defendant in accordance with Federal Civil Rule 4. Said requirement is invoked herein by the Plaintiff.

Wherein, the Plaintiff demands the following relief:

(1)     Trial by jury of all issues so triable.

(2)     Compensatory damages against the Defendant in the amount of $10 Million.

(3)     Punitive damages for Defendant's wanton malice, mail fraud, joined with fraudulent filings to the Court and Plaintiff in the amount of $10 Million.

(4)     Under <u>Forma</u> <u>Pauperis</u> standing, Plaintiff invokes the statutory demand for this Court to effect service of process upon the Defendant.

(5)     Plaintiff demands all costs to be reimbursed by the Defendant regarding each element involving the instant litigation.

(6)     Plaintiff demands this Court's Hearing in considering legal fees that the Defendant should be liable for in the action.

(7)     Plaintiff requests all the relief available for the benefit of Justice.

(8)     Plaintiff requests this Court's liberal interpretation of all the <u>Pro-Se</u> litigation filings in this action.

(9)     Plaintiff requests this Court's appointment of counsel under standard that is well established in the U.S. Court Of Appeals For The Ninth Circuit.

(10)    Plaintiff requests that this Court either stay the instant proceeding or grant interlocutory relief after the Defendant files his papers in this action, so that the U.S. Court Of Appeals For The Ninth Circuit may review this proceeding under consideration with <u>USA v. Meisner</u> 07-10008 (9th Cir. 2009).

(11)    Plaintiff requests the right to supplement or amend this action under Federal Rule 15.

Dated: March 10, 2009                              Respectfully submitted,


                                                   _Eric John Meisner_
                                                   Eric John Meisner
                                                   <u>Pro-Se Prisoner Plaintiff</u>


The Original and Two Copies Sent:

U.S. District Court Clerk's Office
Sandra Day O'Conner Courthouse
401 West washington street
Phoenix, Arizona, 85003

Certified # 7008 0500 0000 8658 5237

One Copy Sent To The Following:


U.S. Court Of Appeals For The Ninth Circuit
95 seventh Avenue
P.O. Box 193939
San Francisco, California, 94119-3939

Certified # 7008 0500 0000 8658 5251


Ann Birmingham Scheel
Asst. U.S. Attorney
Two Renaissance Square
40 North Central Avenue, Suite 1200
Phoenix, Arizona, 85004-4408

Certified # 7008 0500 0000 8658 5244


Anders Rosenquist
Rosenquist & Associates
80 E. columbus
Phoenix, Arizona, 85012

Certified # 7008 0500 0000 8151 4522

## EXHIBIT LIST

EXHIBIT ONE: Government Interstate Highways verification of
the crime scene speed limit dated May 31, 2003,
wherein the crime scene occured on September 6,
2004.

EXHIBIT TWO: August 25, 2005 Donald Manno's Supplemental
Memorandum in Support Of Motion To Suppress,
in Criminal Case No. 04-CR-01073-DCG Docket Text
# 46.

EXHIBIT THREE:
May 15, 2006 Expert Stuart allen Report under
the trade name of International Media Services,
Inc. Legal Services Group.

EXHIBIT FOUR:
June 21, 2006 Denial Order of Motion To Dismiss
(Docket # 32) by Honorable Judge David G. Campbell
in Criminal Case No. 04-CR-01073-DCG, Docket text
#74.



*Current route in Arizona:* JCT I-10 in Phoenix to JCT I-40 in Flagstaff
*Length:* 146 mi

*Junctions:* I-10, US 60, I-10, US 60, AZ 101, AZ 74, AZ 69, AZ 169, AZ 260, AZ 279, AZ 89A, I-40

See also Black Canyon Highway, Maricopa Freeway

---

I-17 is one of Arizona's two Interstates that do not go between states. The southern section was built along AZ 69 from Phoenix to Cordes Jct. The northern section was built along AZ 79. Arizona started AZ 79 in 1954, but it was quickly incorporated into the then-new Interstate system. Arizona left the undivided portions as AZ 79 until 1968.

I-17 was the first freeway segment built in Phoenix, in the late 1950s. Some of the old sections have been replaced, particularly around the I-10 interchange and the US 60 overpass. The latter overpass was particularly bad -- Grand Ave. (US 60) along with Thomas Rd. had substandard clearances, so there were elaborate warning signs to keep trucks from getting stuck. There were still quite a few scrapes on the bridge, though.

After I-10 was redirected from the Durango Curve to a through-town alignment in 1969, I-17 was extended "south" (actually east) to where it would meet I-10.



I-17 has one Business Loop, in Black Canyon City. It follows the old alignment of AZ 69.

 

To improve traffic flow at the old Happy Valley Rd. interchange, ADOT is experimenting with roundabouts at the ends of the ramps, rather than the usual stop signs or traffic lights.

I-17's mileposts begin at 194, which suggests that it is an extention of I-19. Not quite. I-17 inherited its mileposts from AZ 69. So where did AZ 69 get its numbering? Arizona usually begins a new highway's mileposts equal to the milepost on the number of the highway it branches from. AZ 69 intersected old US 89 at milepost 201. When I-17 was extended south, the numbers were continued back to 194. Because US 89 began at Nogales, the same place I-19 starts, the numbers almost line up.

## Click the name of an attraction to visit it
# I-17 EXIT LIST

| EXIT | NORTHBOUND EXITS Read down SPEED LIMIT 55 | | SOUTHBOUND EXITS Read up SPEED LIMIT 55 | |
|---|---|---|---|---|
| | | | **10** EAST **60** EAST | |
| | | | Globe Tucson | |
| | | | **10** WEST | |
| 194 | | | | |
| 195A | | | Sky Harbor Airport | |
| 195B | 7th St Central Ave | | 16th St | |
| 196 | 7th Ave | | 7th St | |
| 197 | 19th Ave State Capitol | | 7th Ave Central Ave | |
| 198 | Buckeye Rd | | Durango St 19th Ave | |
| 199A | Grant St | | | |
| 199B | Adams St Van Buren St | | Grant St Buckeye Rd | |
| | | | Jefferson St State Capitol | |
| 200A | **10** EAST WEST | **10** WEST | **10** WEST | **10** EAST |
| | Tucson | Los Angeles | Los Angeles | Tucson |

| Exit | | |
|---|---|---|
| 200B | McDowell Rd | McDowell Rd<br>Van Buren St |
| | **60** WEST | **60** WEST |
| 201 | Thomas Rd<br>Grand Ave | Thomas Rd<br>Grand Ave |
| 202 | Indian School Rd<br>VA Hospital | Indian School Rd<br>VA Hospital |
| 203 | Camelback Rd | Camelback Rd |
| 204 | Bethany Home Rd | Bethany Home Rd |
| 205 | Glendale Ave | Glendale Ave<br>Luke AFB |
| 206 | Northern Ave | Northern Ave |
| 207 | Dunlap Ave<br>Glendale Comm College<br>Ottawa Univ | Dunlap Ave<br>Glendale Comm College<br>Ottawa Univ |
| 208 | Peoria Ave | Peoria Ave |
| **208** | **SPEED LIMIT 65** | **SPEED LIMIT 55** |
| 209 | Cactus Rd | Cactus Rd |
| 210 | Thunderbird Rd<br>Ariz State Univ<br>West Campus<br>Amer Graduate School<br>of Intl Mgmt | Thunderbird Rd<br>Ariz State Univ<br>West Campus<br>Amer Graduate School<br>of Intl Mgmt |
| 211 | Greenway Rd | Greenway Rd |
| 212 | Bell Rd | Bell Rd |
| 214A | Union Hills Dr | Union Hills Dr |
| 214B | Yorkshire Dr | Yorkshire Dr |
| 214C | WEST LOOP EAST<br>**101** | EAST LOOP WEST<br>**101** |
| 215A | Rose Garden Ln | |
| 215B | Deer Valley Rd<br>Deer Valley Airport | Deer Valley Rd<br>Rose Garden Ln<br>Deer Valley Airport |
| | Rock Art Museum | Rock Art Museum |
| 217 | Pinacle Peak Rd | Pinacle Peak Rd |
| 218 | Happy Valley Rd | Happy Valley Rd |
| **219** | **SPEED LIMIT 75** | **SPEED LIMIT 65** |
| | **74** | **74** |
| 223 | Carefree Highway<br>Wickenburg | Carefree Highway<br>Wickenburg |
| | Ben Avery Shooting Range<br>Lake Pleasant Regional Park | Ben Avery Shooting Range<br>Lake Pleasant Regional Park |
| 225 | Pioneer Rd<br>Pioneer Living History<br>Museum | Pioneer Rd<br>Pioneer Living History<br>Museum |
| 227 | Daisy Mountain Rd | Daisy Mountain Rd |
| 229 | Anthem Way | Anthem Way |
| 233 | New River | New River |
| 236 | Table Mesa Rd | Table Mesa Rd |

| | | |
|---|---|---|
| 242 | [BUSINESS 17] Rock Springs Black Canyon City | [BUSINESS 17] Black Canyon City Rock Springs |
| 244 | [BUSINESS 17] Black Canyon City Clearwater Canyon Rd | [BUSINESS 17] Black Canyon City Clearwater Canyon Rd |
| 245 | SPEED LIMIT 65 | SPEED LIMIT 75 |
| 247 | Bumble Bee Crown King Horse Thief Basin Recreation Area | Bumble Bee |
| 250 | SPEED LIMIT 75 | SPEED LIMIT 65 |
| 252 | Sunset Point Scenic View Rest Area | Sunset Point Scenic View Rest Area SAFETY PULLOUT Use Rest Area |
| 256 | Badger Springs Rd | Badger Springs Rd |
| 259 | Bloody Basin Rd | Bloody Basin Rd Cleator Crown King Horse Thief Basin Recreation Area |
| 262 | NORTH 69 Prescott Cordes Lakes Rd Arcosanti | |
| 262A | | Cordes Jct Cordes Lakes Rd Arcosanti |
| 262B | | NORTH 69 Prescott |
| 268 | Orme Rd Dugas Rd | Orme Rd Dugas Rd |
| 278 | [169] | [169] |
| 279 | Cherry Rd SPEED LIMIT 65 | Cherry Rd SPEED LIMIT 75 |
| 280 | SAFETY PULLOUT Trucks Vehicles Pulling Trailers Check Brakes And Equipment | [unmarked pullout] |
| 283 | RUNAWAY TRUCK RAMP Left Exit | |
| 285 |  |  |

| Mile | Left | Right |
|------|------|-------|
| | General Crook Tr | General Crook Tr |
| | Ft Verde State Park | |
| | **260** TO **89A** | **260** TO **89A** |
| 287 | Cottonwood<br>Payson<br>Jerome<br>Clarkdale | Cottonwood<br>Payson<br>Jerome<br>Clarkdale |
| | Tuzigoot Natl Monument<br>Dead Horse State Park | Tuzigoot Natl Monument<br>Dead Horse State Park<br>Ft Verde State Park |
| 288 | **SPEED LIMIT 75** | **SPEED LIMIT 65** |
| 289 | Montezuma Castle<br>National Monument<br>Middle Verde Rd | Montezuma Castle<br>National Monument<br>Middle Verde Rd |
| | **30** | **30** |
| 293 | McGuireville<br>Cornville<br>Rimrock<br>Lake Montezuma | McGuireville<br>Cornville<br>Rimrock<br>Lake Montezuma |
| 296 | Montezuma Well<br>Rest Area | Montezuma Well<br>Rest Area |
| 298 | **179** NORTH | **179** NORTH |
| | Sedona | Sedona |
| | Oak Creek Canyon | Oak Creek Canyon |
| 300 | | **RUNAWAY TRUCK RAMP** |
| 306 | Stoneman Lake Rd | Stoneman Lake Rd |
| | | Scenic View |
| 313 | | **SAFETY PULLOUT**<br>**Use Scenic View** |
| 315 | Rocky Park Rd | Rocky Park Rd |
| 317 | Fox Ranch Rd | Fox Ranch Rd |
| 320 | Schnebly Hill Rd | Schnebly Hill Rd |
| 322 | Munds Park<br>Pinewood Blvd | Munds Park<br>Pinewood Blvd |
| 326 | Willard Springs Rd | Willard Springs Rd |
| 328 | Newman Park Rd | Newman Park Rd |
| 331 | Kelly Canyon Rd | Kelly Canyon Rd |
| 333 | Kachina Blvd<br>Mountainaire Rd | Kachina Blvd<br>Mountainaire Rd |
| 334 | **SPEED LIMIT 65** | **SPEED LIMIT 75** |
| | **89A** SOUTH | **89A** SOUTH |
| 337 | Pulliam Airport<br>Coconino County Fairgrounds | Sedona<br>Pulliam Airport<br>Coconino County Fairgrounds<br>Oak Creek Canyon |
| 339 | Lake Mary Rd<br>Mormon Lake | Lake Mary Rd<br>Mormon Lake |





**340**

**SPEED LIMIT 55**

340A

EAST
**40**
Albuquerque

340B

WEST
**40**
Los Angeles

341

**SPEED LIMIT 35**

341

McConnel Dr

NORTH ARIZONA TO
**89A** **180**

Milton Rd
Flagstaff
Grand Canyon

**SPEED LIMIT 65**

EAST
**40**
Albuquerque

WEST
**40**
Los Angeles

**SPEED LIMIT 55**

Return to Interstate Routes
Return to Arizona Roads

*Last updated 5/31/2003*

*See pages 1, 3, 4 and 5*

Donald F. Manno, Esquire
900 Dudley Avenue, Suite 250
Cherry Hill, New Jersey 08002
856-665-6464, fax 856-665-1044
Appearing for: Eric John Meisner

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

*Docket #46
August 25, 2005
Filing*

| | |
|---|---|
| UNITED STATES | ) |
| | ) |
| | ) CASE NO. 04-CR-1073-ALL |
| | ) |
| v. | ) |
| | ) |
| | ) SUPPLIMENTAL MEMORANDUM IN |
| | ) SUPPORT OF MOTION TO SUPRESS |
| ERIC JOHN MEISNER | ) |

### FACTS

On September 6, 2004, the defendant was driving a rental car east on I-40 in the area of the intersection of I-17. At approximately 11:55 pm he was directed to stop by Officer M. R. Craft of the Arizona Department of Public Safety. He pulled over to the side of the road. Officer Craft said that he observed the vehicle speeding[1] at milepost 339 on Interstate 17. The officer allegedly used his radar device to note the defendant's speed as 62 miles per hour.[2]

Officer Craft had the driver, defendant Eric Meisner, exit the vehicle so that he could issue him a warning ticket for the alleged excessive speed.[3] The defendant was left outside at the rear of his vehicle on this cold night for a protracted period of time. He was wearing shorts and sandals and was shaking, from the cold. He was continually moving in order to keep warm.

---

[1] The fact that the vehicle was actually speeding is contested. Only a warning ticket was issued. No information concerning any particular radar device or other speed calibration device has ever been presented. It is alleged *infra* that the "speeding" was a pretext for the motor vehicle stop.

[2] For reasons noted infra, this was not speeding because the speed limit at this location was 65 miles per hour, not 55 miles per hour as the officer mistakenly believed.

[3] It is alleged *infra* that the removal of the defendant from the vehicle for this purpose was another Sixth Amendment intrusion which warrants suppression of all that followed.

After returning to his vehicle, Officer Craft ran a warrant check on the defendant and completed the warning ticket. The defendant was left outside the entire time. Officer Craft then exited his vehicle, had the defendant sign for the warning ticket and gave him back his travel documents. The defendant was told he was not free to leave and the officer continued to question him. After a protracted period of time, the officer told the defendant that his license was valid in New Jersey and that he was free to go.

As the defendant was walking back to his vehicle, the officer again questioned him and elicited "consent" to search the vehicle. The questioning of the defendant continued. Both he and his passenger[4] were ordered to wait at the front of their vehicle while the officer and his back up, who had just arrived, conducted the search. The passenger was placed in the rear of Officer Craft's vehicle.

During the course of the search, the defendant asked if he could withdraw his consent. He stated that he wanted to leave immediately because he was tired and he had to go to the bathroom very badly. Officer Craft immediately got angry and started to argue with the defendant and question him in an accusatory manner. When the defendant again told the officer that he wanted to withdraw his consent, the officer told him that he was "detained" and that a K-9 officer and dog would be requested. The defendant was then ordered into the rear seat of Officer Craft's vehicle.

After a protracted period of time and more than an hour after the initial stop, a K-9 unit arrived. The dog was walked around the car and did not alert. After being prompted by its handler, the dog jumped upon the driver's side trunk of the car. The officers then immediately went to the rear passenger door and removed the door panel. Suspected cocaine was removed. The defendant and his passenger were placed in separate police cars and taken to the station for processing. The defendant has been charged with possession with intent to distribute the cocaine found in the rear passenger door panel of the car, which had been rented by another person.

**Argument**

It is respectfully submitted that the evidence seized by the police officers should be suppressed from use in evidence by the government. The entire incident, from the traffic stop to the defendant's removal to the station was video and audio taped by the recording devices located on Officer Craft and in his vehicle. It is expected that the testimony of Officer Craft, his back up officer, the K-9 officer, the defendant and the video/audio tapes will establish the facts noted herein. The videotape will also definitively establish the respective times for these events.

---

[4] The passenger, Dana Pinchot, was originally charged along with the defendant. He died before the indictment was returned.

2

## I.   THE INITIAL STOP WAS PRETEXTUAL AND WAS NOT BASED UPON ANY ARTICULABLE SUSPICION

The defendant respectfully submits that he was not speeding and that there was no valid basis for the officer to stop his vehicle.  Other than Officer Craft's conclusory statement, nothing has been proffered indicating any basis for the defendant's alleged "speeding."  A summons was not given.  The officer was located at the intersection of milepost 339 on Interstate 17 facing the northbound traffic.  This is evident from the fact that he claims the defendant was speeding on I-17 northbound and was stopped on I-40 eastbound.  It would have been virtually impossible for the defendant to be speeding as the officer observed him and then to exit onto the intersecting highway.  Further, the speed limit at milepost 339, where the officer was located was 65 miles per hour.  The defendant was clocked at 62 miles per hour.

Ever since the landmark case of Delaware v. Prouse, 440 U.S. 648 (1979) stopping an automobile and detaining its occupants, no matter how briefly, constitutes a seizure and must be supported by at least an articulable suspicion that a law has been violated.  As recently as 2003, the Ninth Circuit has affirmed this principle in Bingham v. City of Manhattan Beach, 341 F.3d 939, 948 (9th Cir 2003)

> It has been settled law since the 1970's that in order for a police officer to initiate an investigatory stop of a motorist, there must at least exist reasonable suspicion that the motorist is engaging in illegal activity. See, e.g., Delaware v. Prouse, 440 U.S. 648, 663 (1977) (requiring "at least articulable and reasonable suspicion that a motorist is unlicensed or that an automobile is not registered, or that either the vehicle or an occupant is otherwise subject to seizure for violation of law" in order to stop an automobile and detain the driver). At page 948.

The first Ninth Circuit case cited by the government in their response to the instant defendant's motion to suppress is very instructive.  U.S. v. Lopez-Soto, 205 F.3d 1101 (9th Cir 2000) begins its analysis with the proposition that the U.S. Supreme Court decision in Whren v. United States, 517 U.S. 806 (1996) does not require probable cause for a traffic stop and that "reasonable suspicion" is the appropriate standard.  The Ninth Circuit then went on to analyze the specific facts of the case and ultimately suppressed the 400 kilograms of marijuana found in Lopez-Soto's car.

3

The officer stopped Lopez-Soto's vehicle because he had been instructed in his police academy training that the law of Baja California, Mexico, where the car was registered, required a registration sticker on the rear window. This was wrong and the actual law required that the sticker be on the front windshield. In any event, based upon this mistaken, albeit good faith view of the law, the Court held that the traffic stop "...was not objectively grounded in the law." What the officer reasonably suspected was simply not a violation of the law. "This cannot justify the stop under the Fourth Amendment." The Ninth Circuit found that the officer violated the defendant's Fourth Amendment rights by the traffic stop and suppressed the 800 pounds of marijuana seized.

In the instant case the officer was on interstate highway 17 at milepost 339. He was facing south observing traffic coming north from mile marker 338. At this point the speed limit was 65 miles per hour. It did not officially change to 55 miles per hour until mile marker 340, one mile north of where the officer was posted and one mile north of where the officer alleged the defendant was speeding. The officer stated that while at mile marker 339, using his radar gun, he clocked the defendant's vehicle at 62 miles per hour. He mistakenly believed that the speed limit was 55 miles per hour as he saw the defendant approach mile marker 339 from the south. This was an error of law in his understanding the speed limit. It is the exact same type of error of law that caused the 800 pounds of marijuana to be suppressed in the <u>Lopez-Soto Case</u>.[5]

The Ninth Circuit makes a clear distinction between a mistake of fact and a mistake of law when an officer initiates a traffic stop based upon a mistaken belief. "If an officer makes a traffic stop based upon a mistake of law, the stop violates the Fourth Amendment." <u>United States v. Twilley</u>, 222 F.3d 1092, 1096 (9th Cir. 2000). In this case an officer stopped the defendant based upon the mistaken belief that the defendant was violating California law by displaying only one license plate. This was not a violation of California law. The Court held that the officer lacked reasonable suspicion to stop the defendant because reasonable suspicion cannot be based upon a mistaken understanding of the law. In the instant case, the defendant's alleged violation of the speed law is the same type of mistake.

Also a similar mistake of law can be found in <u>United States v. King</u>, 244 F.3d 736 (9th Cir 2001). There the officer stopped a car with a placard hanging from the rear view mirror, which he believed was illegal. The Court concluded that it was not illegal; that the officer had made a mistake of law and that he did not have reasonable suspicion to justify the motor vehicle stop.

---

[5] It is likely that the officer will claim that the 55-mile per hour sign was posted south of his location at mile marker 339. Even if this were so, it has the same effect as the officer's erroneous training in the <u>Lopez-Soto Case</u>. The <u>actual speed limit at milepost 339 was 65 miles per hour</u>, even if (and it is asserted that it was not) a sign to the contrary was posted south of that milepost. A false representation of the law to the officer by either his superiors at the academy or the highway department signs does not alleviate the Fourth Amendment violation.

In the instant case, the officer's mistake was as to the speed limit at the location of his observation of the defendant's vehicle. He believed that at that location it was unlawful for the defendant to be traveling at 62 miles per hour. The actual lawful speed limit at that location was 65 miles per hour. This mistake as to the lawful speed limit has to do with the characterization of the facts as lawful or unlawful, just like the mistakes in Twilley and King, supra. For purposes of this argument, the defendant's speed is a fact that is not in issue. It was lawful and the officer's interpretation to the contrary was a mistake of law negating any reasonable suspicion justifying the traffic stop.

## II.  THE OFFICER'S INQUIRY AFTER THE INITIAL TRAFFIC STOP WAS BEYOND THE SCOPE REQUIRED AND THEREFORE IT CONSTITUTED AN UNLAWFUL SEARCH

The traffic stop in the instant case was for speeding. There was no need to detain the defendant beyond the initial period necessary to write a citation. Inquiry beyond the facts necessary to establish the traffic violation was both unnecessary and beyond the scope of the justification for the stop. The detention of the defendant was excessively broad in both duration and scope.

The Ninth Circuit has made it clear that automobile stops will be analyzed in terms of the Fourth Amendment principles enunciated in Terry v. Ohio, 392 U.S. 1 (1968). See U.S. v. Mayo, 04-10076 (9th Cir. 2005). In U.S. v. Washington, 387 F.3d 1060, 1068 (9th Cir. 2004) the Court adopted the five factors to determine whether a person was "seized" for Fourth Amendment purposes. These factors are: (1) the number of officers; (2) whether guns were displayed; (3) whether it was a public or private setting; (4) whether the authoritative manner of the officer would imply compliance was required; and (5) whether the detainee was advised of his right to terminate the encounter.

" A seizure premised upon reasonable suspicion, such as a Terry-stop, is not per se unconstitutional under the Fourth Amendment so long as it is sufficiently brief and minimally intrusive." U.S. v. Washington, 387 F.3d 1060, 1069 (9th Cir. 2003). In this case, the defendant was "seized" (Terry-stop) outside his hotel room, patted down for weapons and asked whether he had a methamphetamine lab inside. He emphatically denied any involvement. The Ninth Circuit stated: "The officers' encounter with Washington [defendant] should have ended there, but it did not...The scope of the detention must be carefully tailored to its underlying justification." U.S. v. Washington, supra at page 1069.

5

The fact that the defendant appeared nervous is insufficient to arouse the officer's suspicion in order to expand his inquiry from a traffic stop to a criminal investigation justifying further detention. U.S. v. Chavez-Valenzuela, 268 F.3d 719, 725 (9th Cir 2001). In the instant case it was the nervousness of the passenger, not the defendant driver that the officer cites as cause for further detention and investigation. All of the observations and questions up to that point were innocent and did not justify detention, much less suspicion.

In the instant case, the underlying justification was alleged excessive speed, a traffic violation. The totality of the circumstances demonstrates that there was no basis to expand the detention into an investigation for drugs.

## III. EVIDENTIARY HEARING

As properly argued in the response of the defendant's former counsel Mr. Berardoni, to the government's answer to the motion to suppress, an evidentiary hearing is required. There are definite non-conjecture issues of fact that cannot be resolved without the testimony of all of the participants in the traffic stop, subsequent search of the vehicle and arrest of the defendant. This includes the several officers of the Arizona Department of Public Safety, as well as the viewing of an authenticated copy of all video and audio tape recordings of the incidents. Those officers who have been identified to date are; M.R. Craft, ID No. 6010, J. Tarr, ID No. 5987, J. Adams, ID No. 3437, B. Elliott, ID No. 5286, and Sgt. B. Eckhoff, ID No. 4034.

This hearing is necessary to establish Officer Craft's mistake of law as well as the facts alleged herein. The defendant challenges the alleged voluntariness of the consent to search and alleges that the video/audio tape of the incident was altered in order to present a distorted view of the events and their sequence. All of these matters will be established at the evidentiary hearing.

Respectfully submitted,

/s/  Donald F. Manno
Donald F. Manno
Attorney for Eric John Meisner

6

# Exhibit #3

**INTERNATIONAL**

**MEDIA**

**SERVICES, INC.**

LEGAL SERVICES GROUP

718 SHERMAN AVENUE, PLAINFIELD, NEW JERSEY, 07060-2232  USA

908 756-4060 voice/fax          stuart.allen1@worldnet.att.net

Forensic Evidence Recovery and Analysis since 1976.

---

*PRELIMINARY REPORT*

**Donald F. Manno, Esquire**
**Attorney at Law**
900 Dudley Avenue
Cherry Hill, NJ 08002

May 15, 2006

---

RE:    **Forensic Examination and Analysis of MobileVision Videotape**
SUB:   **United States v. Eric John Meisner**
DOC:  **04-CR-01073 U.S. District Court, Dist. Of Arizona, Houston Div.**
EVID: **STD VHS Videocassette A2 DPS Tape No: 200402601028  (AEL Exhibit QV-1C  09/06/2004)**

---

Dear Counsellor:

I have performed a preliminary analog and digital examination of the questioned MobileVision videocassette A2 DPS Tape No: 200402601028 "QV-1C" submitted to this office for authentication on May 10, 2006, with regard to the above captioned matter. Also submitted for review was the forensic report of Mr. Barry Dickey, from Audio Evidence Lab, dated March 27, 2006.

The focus of the examination was to determine the following:

1. Is the videotape authentic?
2. Is the videotape the original videotape recorded simultaneously with the events taken place?
3. Has the video content or the images contained therein been edited, altered or manipulated?
4. Has the audio content contained therein been edited, altered or manipulated in any way?

The submitted videotape QV-1C is a poorly made multi-generational copy produced from an analog recording and is not the original recording of the events taking place. Therefore, the content thereof cannot be authenticated under Federal Forensic Guidelines. [U.S. v. McKeever, 169 F. Supp. 426 (SDNY 1958)]

Furthermore, hundreds of anomalies, including dropouts, can be observed within the recorded videocassette historically consistent with a poorly made copy or a problem within the source playback unit or recording device. There are no overt anomalies observed that suggest editing, alteration or manipulation by standard analog devices in the copy examined. The time/date stamp appears to be continuous. The recording appears to be whole and complete but as a copy it would be expected to be. The determination as to whether or not the original QV-1 is whole and complete cannot be made by examining a copy thereof.

The forensic analysis that is required to determine if the videotape has been altered using professional studio editing devices or non-linear digital devices cannot be performed on a copy, since the characteristic signals are being masked by artifacts produced in the duplication process.

The audio component of QV-1C was stripped from the videocassette and examined independently of the video component. Parts of the conversations are missing as the result of the uniformed officers on scene turning off their RF microphones during portions of their investigation. The audio track appears to be whole and complete and continues recording during the portions of the tape when the microphones were shut off. There are no overt anomalies observed that suggest editing, alteration or manipulation by standard analog devices in the copy examined. The determination as to whether or not the audio tracks in the original QV-1 are whole and complete cannot be made by examining a copy thereof.

We have reviewed the reports submitted by Mr. Barry Dickey, as it pertains to the examination of both QV-1C, the copy and QV-1 the original video and although it appears to be thorough and complete, no reference was made to the examinations required to determine if the submitted videotape was altered, edited or manipulated by digital, non linear devices which would be very difficult to detect using standard forensic techniques. He further indicated that frame analysis was performed only on the initial 10 minutes of the "event in question" when the entire event should have been forensically examined.

For the reason set forth herein and above, the MobileVision videocassette QV-1C submitted is a copy and therefore, it cannot be stated with any degree of certainty that the contents of a videotape copy represent a true and accurate record of the events taking place. QV-1C cannot be authenticated.

Furthermore, it is the recommendation of our firm that the original MobileVision videotape recording be produced and delivered to our laboratory for non-destructive forensic examination. We are aware of the inconvenience this may cause to all parties; however, we cannot bring this matter to a successful conclusion by any other means. Historically an order of the court so directing will be required and arrangements can be made through the FBI Somerset RA should that also be necessary.

Please advise as to how you wish to proceed in this matter and if you wish the submittal of a formal report with exhibits.

Respectfully submitted,


**International Media Services. Inc.**
**LEGAL SERVICES GROUP**

*Stuart Allen*

**Stuart Allen, ACFE, ABRE,  SMPTE, IEEE,**
President & Chief Engineer

*State of New Jersey*
**Vendor Id: 222-125-765/000**


www.intlmediasvcs.com

*member:*
American College of Forensic Examiners
American Board of Recorded Evidence
Society of Motion Picture and Television Engineers
The Institute of Electrical and Electronic Engineers

*Exhibit #4*

*See pages 1, 2 and 9*

1  **WO**

2

3

4

5

6              IN THE UNITED STATES DISTRICT COURT

7                  FOR THE DISTRICT OF ARIZONA

8

9  United States of America,            ) CR 04-1073-PCT-DGC

10              Plaintiff,               ) **ORDER**

11  vs.                                  )

12  Eric John Meisner,                   )

13              Defendant.               )

14

15         Defendant Eric John Meisner has been charged with possession with intent to

16  distribute five kilograms or more of cocaine. The cocaine was found concealed in Meisner's

17  car during a traffic stop. Meisner filed a motion to suppress evidence obtained as a result of

18  the traffic stop. Doc. #32. The parties have filed additional responsive and supplemental

19  briefs. (Docs) ##37, 39, (46) 48, 70, 72. The Court held an evidentiary hearing on May 16,

20  2006, and heard testimony from Defendant and the Arizona Department of Public Safety

21  ("DPS") officers involved in the stop. The Court also viewed a videotape of the traffic stop

22  made by a camera in the DPS patrol car. The Court concludes that the traffic stop and search

23  of Defendant's vehicle did not violate his constitutional rights.

24  I.     FACTUAL BACKGROUND.

25         On September 6, 2004, Defendant and Dana Pinchot were traveling north on Interstate

26  17 near Flagstaff, Arizona. DPS Officer Mace Craft was stationed in the median north of

27  milepost 339, monitoring northbound traffic.  As Defendant's car approached, Craft

28  suspected the car was speeding. Craft's radar confirmed that Defendant was traveling 62

000000005

miles per hour, seven miles per hour faster than the posted speed limit. Craft began following Defendant's car and pulled it over after it turned onto Interstate 40. The video camera in Craft's patrol car began recording the stop when he activated his lights and siren.

As Craft exited his patrol car, he forgot to turn on his personal microphone. Thus, although the entire traffic stop is recorded by videotape, several minutes have no sound. Craft testified at the hearing concerning the conversations that occurred during this period.

Craft approached the car on the passenger's side and requested Defendant's license and the vehicle registration. As he stood at the car window, he noticed that Pinchot was shaking uncontrollably and that both occupants were making quick movements. Craft noticed a bottle of spray air freshener between the front seats and an open box of dryer fabric softening sheets on the passenger side of the back seat. Both occupants engaged in small talk and appeared overly friendly. Craft testified from his training and experience that air fresheners are often used by drug smugglers as a masking agent for the smell of narcotics.

Craft asked Defendant to come back to his patrol car to answer some questions. Defendant complied. In response to Craft's questions, Defendant said they were traveling from Las Vegas to Oklahoma City. As the most direct route for this trip is Interstate 40, Craft asked why they were traveling north on Interstate 17. Defendant stated that they had stopped at a casino named "Mata-something." Craft knew of no such casino on Interstate 17. While speaking with Defendant beside his patrol car, Craft noted that Defendant was pacing and wiping his hands on his trousers.

Craft examined the rental contract for the vehicle and noticed that it was past due. The vehicle was to have been returned in Las Vegas the previous day. Craft then approached the passenger's side of the vehicle a second time and spoke briefly with Mr. Pinchot. Pinchot stated that he and Defendant were traveling from Las Vegas to New Jersey (not Oklahoma). Craft noticed that Pinchot was "fidgety" and avoided making eye contact.

After issuing a warning and receiving confirmation that there were no outstanding warrants for Defendant's arrest, Craft wished Defendant a safe trip. As Defendant began walking back to his vehicle, Craft asked if he would respond to a few additional questions.

- 2 -

1   Craft then informed Defendant that there was much criminal activity on the interstate and
2   asked if Defendant was carrying illegal drugs.  Defendant said no and suggested that Craft
3   could search the vehicle if he wished.  Craft confirmed that Defendant consented to a search.
4   After obtaining the passenger's consent, Craft began his search.

5       While searching, Craft found a receipt that showed the vehicle had been in Tucson the
6   day before and that $2,000 had been wire transferred from Tucson.  He also found machine-
7   sealable "food saver" bags in the trunk – bags he knew to be used by drug smugglers.

8       Craft and another officer who joined him at the scene found that the rear passenger-
9   side window of the vehicle could not be lowered.  It also appeared that the rear passenger-
10  side door panel had recently been removed.  As Craft began examining the door more
11  closely, Defendant approached and asked what would happen if he withdrew his consent to
12  the search.  Craft informed him that he was free to withdraw his consent, in which event
13  Craft would request a K-9 unit to conduct a drug sniff of the vehicle.  Defendant then stated
14  that Craft could continue his search.  Shortly after Craft returned to the rear passenger door,
15  Defendant approached again and withdrew his consent.  Craft called for a K-9 unit.

16      While awaiting arrival of the K-9 unit, Craft and the other DPS officer suggested that
17  Defendant and Pinchot could sit in the rear of the patrol vehicle to remain warm on the chilly
18  evening.  A K-9 unit arrived approximately 40 minutes after it had been called.  K-9 officer
19  John Adams testified that he was awakened and called to the scene shortly after midnight.
20  He dressed, retrieved his dog, and reported to the scene as quickly as possible.  The drug
21  sniffing dog, which Officer Adams characterized as "exceptionally" reliable, promptly
22  alerted to the rear of the car.  On the basis of this alert, Officer Craft continued his search and
23  located approximately 16 pounds of cocaine in the rear passenger door panel.  Defendant was
24  then placed under arrest.

25  **II.    THE TRAFFIC STOP AND SEARCH WERE CONSTITUTIONAL.**

26      "The constitutionality of an investigative detention is judged under the framework
27  established in *Terry v. Ohio*, 392 U.S. 1 (1968), requiring that the scope of an investigative
28  detention 'must be carefully tailored to its underlying justification . . . and may last no longer

- 3 -

1  than is necessary to effectuate the purpose of the stop.'" *United States v. Chavez-Valenzuela*,

2  268 F.3d 719, 724 (9th Cir. 2001) (quoting *Florida v. Royer*, 460 U.S. 491, 500 (1983)).

3  An officer must initially restrict the questions he asks during the stop to those reasonably

4  related to the justification for the stop, and may expand the scope of the stop only if he

5  notices particularized, objective factors arousing his suspicion. *See id.*; *U.S. v. Diaz-Juarez*,

6  299 F.3d 1138, 1141 (9th Cir. 2002).

7       **A.    The Initial Stop Was Valid.**

8       Craft testified that his radar clocked Defendant traveling 62 miles per hour in a 55-

9  mile-per-hour zone. On cross-examination, defense counsel noted that Craft's report states

10  that he was stopped at milepost 339 on Interstate 17. Defendant then introduced a

11  photograph showing that the 55-mile-per-hour sign is located north of milepost 339. In

12  response, Craft testified that the 55-mile-per-hour sign is approximately three-tenths of a mile

13  north of milepost 339 and that his vehicle was positioned north of the sign. Craft testified

14  that Defendant was traveling 62 miles per hour after he had passed the sign. The Court found

15  this testimony to be credible.

16      A law enforcement officer may stop a driver without violating the Fourth Amendment

17  when the officer has probable cause to believe that a traffic violation has occurred. *See*

18  *Whren v. United States*, 517 U.S. 806, 810 (1996). Craft had probable cause to believe

19  Defendant was speeding. The stop was valid.

20      **B.    Other Actions During the Stop Did Not Violate the Fourth Amendment.**

21      Having made a valid stop of Defendants' car, Craft was permitted to ask questions

22  and take other actions reasonably related to the purpose of the stop. *See United States v.*

23  *Murillo*, 255 F.3d 1169, 1174 (9th Cir. 2001). The Fourth Amendment was violated only if

24  he expanded the stop beyond its permissible scope without a suspicion based on

25  particularized, objective factors. *See Chavez-Valenzuela*, 268 F.3d at 724. The Court's

26  Fourth Amendment analysis must ultimately be based on the totality of the circumstances

27  involved in the stop. *See United States v. Arvizu*, 534 U.S. 266, 273-74 (2001); *United States*

28

-4-

1  *v. Hernandez*, 313 F.3d 1206, 1212 (9th Cir. 2002).  Initially, however, the Court will
2  address each element of the stop discussed by the parties in briefing and at the hearing.

3       Craft began by asking Meisner for his driver's license and vehicle registration.  Such
4  a request is permitted under the Fourth Amendment as part of a traffic stop.  *See Chavez v.*
5  *Valenzuela*, 268 F.3d at 724.

6       Craft asked Meisner to exit the vehicle and come back to his patrol car.  He testified
7  credibly during the hearing that he routinely takes this step for his own safety.  Reasonable
8  measures undertaken for officer safety do not violate the Fourth Amendment. *See Terry*, 392
9  U.S. at 23-24.  Moreover, the Ninth Circuit has held that separating individuals for
10 questioning does not violate their Fourth Amendment rights. *United States v. Bautista*, 684
11 F.2d 1286, 1289-91 (9th Cir. 1982).

12      Craft asked Meisner where he was traveling and where he had been.  Such questions
13 are permissible as part of a traffic stop.  *United States v. Pruitt*, 174 F.3d 1215, 1220 (11th
14 Cir. 1999) (implying questions about travel plans are permissible); *United States v. Hill*, 195
15 F.3d 258, 268 (6th Cir. 1999) (stating that questions about a driver's purpose for traveling
16 were reasonably related to a traffic stop for speeding); *Chavez-Valenzuela*, 268 F.3d 724 n.4
17 (citing *Pruitt* and *Hill* favorably on this point).

18      Craft also asked Pinchot questions during the traffic stop.  Pinchot responded
19 voluntarily. The Ninth Circuit has observed that "[s]ometimes the officer will communicate
20 with others, either police or private citizens, in an effort to verify the explanation tendered[.]"
21 *Bautista*, 684 F.2d at 1290 n.3.  The Fourth Amendment does not prohibit an officer from
22 conferring with passengers about travel matters during a traffic stop. *See Florida v. Royer*,
23 460 U.S. 491, 497 (1983); *United States v. Ayon-Meza*, 177 F.3d 1130, 1133 (9th Cir. 1999).

24      Following completion of these steps, Craft issued a written warning to Meisner and
25 told him to have a safe trip.  The entire stop to this point had taken less than ten minutes.
26 "[T]he Supreme Court specifically [has] refused to set a definitive rule on the time limit of
27 a lawful investigative stop, finding instead that the circumstances of each case must be
28 considered." *United States v. Torres-Sanches*, 83 F.3d 1123, 1128 (9th Cir. 1996) (citing

- 5 -

1   *United States v. Sharpe*, 470 U.S. 675, 685 (1985)). The circumstances of this case show that
2   Craft did not delay unreasonably or take an unnecessary amount of time to issue the warning.
3   *See id.* at 1127-29 ("upon reviewing the totality of the circumstances, we find Sanchez being
4   seated in [the] patrol car 20 minutes to be reasonable[.]").

5           Defendant asserts that the traffic stop ended once Craft obtained the license and
6   registration – that nothing more was needed to complete the warning – and that the actions
7   he took thereafter exceeded the permissible limits of the traffic stop. The Court disagrees.
8   The ten minutes from the beginning of the stop to issuance of the warning were used to
9   complete steps reasonably related to the stop – obtaining the license and registration,
10  checking Meisner's and Pinchot's identity by radio, and completing the paperwork required
11  for the warning. Each of these actions reasonably can be viewed as part of a single traffic
12  stop. *See id.* at 1129. The Court will not parse the stop as Defendant suggests. *See United*
13  *States v. Sokolow*, 490 U.S. 1, 8 (1989) ("[I]n evaluating the validity of a stop[,] . . . we must
14  consider 'the totality of the circumstances – the whole picture.'"). Nor did Craft's
15  questioning of Defendant during these actions extend the duration of the stop.

16          What is more, by the time Craft issued the warning he had identified particularized,
17  objective factors that justified extending the stop. These included Pinchot's nervousness, the
18  Defendant's and Pinchot's quick actions, the can of spray air freshener between the front
19  seats, the open box of dryer sheets on the back seat, the inconsistent responses as to where
20  Defendant and Pinchot were traveling, the unusual route Defendant was taking if he was
21  traveling from Las Vegas to Oklahoma, the fact that there is no "Mata-something" casino on
22  Interstate 17, Defendant's pacing and wiping his hands on his pants while waiting beside
23  Craft's patrol car, and the rental contract for the automobile that showed it should have been
24  returned the previous day in Las Vegas. *See, e.g., United States v. Murillo*, 255 F.3d 1169,
25  1174 (9th Cir. 2001) (nervousness); *United States v. Perez*, 37 F.3d 510, 514 (9th Cir. 1994)
26  (nervousness and traveling from a drug source area to a distribution area); *United States v.*
27  *Quintero-Barraza*, 78 F.3d 1344, 1347 (9th Cir. 1996) (air fresheners to mask the odor of
28  drugs); *United States v. Oba*, 978 F.2d 1123, 1128 (9th Cir. 1992) (inconsistent answers and

-6-

1   vague explanations).  These particularized, objective factors, taken together, supported
2   Craft's reasonable suspicion that drugs were being transported and justified extension of the
3   stop to inquire about possible drug trafficking. *See id*; *Royer*, 460 U.S. at 497; *Ayon-Meza*,
4   177 F.3d at 1133.

5        Defendant suggests that each of the factors, taken alone, could be entirely innocent,
6   but this does not render the stop unconstitutional.  It was the cumulative effect of these
7   factors that gave rise to Officer Craft's suspicion of drug trafficking, and Courts repeatedly
8   have held that the totality of circumstances must be considered. *See Arvizu*, 534 at 273-74;
9   *Hernandez*, 313 F.3d at 1212.  The Court finds that Officer Craft's suspicion was reasonable
10  and based on particularized, objective factors.

11       Defendant argued at the hearing that there is in fact a casino on Interstate 17 named
12  Cliff Castle Casino and that it is located at the Montezuma Castle exit.  Defendant argued
13  that he simply had been confused about the exit name – Montezuma Castle – when he had
14  said the casino was named "Mata-something."  But Defendant's confusion about these facts
15  was not known to Craft at the time of the traffic stop.  The question to be addressed in this
16  motion is not whether Defendant had a reasonable explanation for his mistake about the
17  name, but whether Craft had objective, particularized facts sufficient to support a reasonable
18  suspicion based on the totality of the circumstances.  The Court concludes that Defendant's
19  having named an unknown casino added to the totality of the facts giving rise to a reasonable
20  suspicion.

21       Defendant argues that Officer Craft lied when he implied that Defendant was free to
22  leave after the warning was issued.  Officer Craft candidly admitted during the hearing that
23  he would not have permitted Defendant to leave the scene once he formed a reasonable
24  suspicion that drugs were being transported.  The Court concludes, nonetheless, that this stop
25  and investigation were valid.  By the time Officer Craft completed issuing the warning he
26  had obtained sufficient objective facts to justify extending the traffic stop.  The fact that he
27  extended the stop after implying that Defendant was free to leave does not eliminate the
28  reasonable suspicion upon which the extension was based.

- 7 -

1   Nor did Officer Craft's suggestion that Defendant was free to leave render
2   Defendant's consent to search invalid. Officer Craft asked if he could search Defendant's
3   vehicle after informing Defendant that Arizona had drug trafficking problems and asking
4   Defendant if he was transporting drugs. Thus, Defendant knew precisely why Officer Craft
5   wanted to search the car. Defendant readily consented to the search. In fact, Defendant
6   suggested that Craft search the vehicle before Craft asked.

7   Upon conducting the search, Craft found additional evidence that justified extending
8   the search – the Tucson receipt, food saver bags, non-functioning window in a relatively new
9   rental car, apparent tampering with the rear passenger side door, and Defendant's withdrawal
10  of his consent once Craft began looking closely at the rear passenger side door. .Craft clearly
11  had a reasonable basis for requesting a drug-sniffing dog. The dog was transported to the
12  scene as quickly as possible. Almost immediately upon arriving, the dog alerted to the
13  presence of drugs in the vehicle. These events did not violate Defendant's Fourth
14  Amendment Rights.

15  **III.   ALLEGED VIDEOTAPE TAMPERING.**

16  Defendant claims that the videotape from Officer Craft's patrol case has been altered.
17  The Court finds that this argument is not plausible.

18  The videotape began recording when Officer Craft activated his lights and siren to
19  pull over Defendant's vehicle. The tape runs continuously until Defendant is taken into
20  custody more than one hour later. The timer in the lower right-hand corner of the videotape
21  runs continuously and without interruption from the initial activation to the final arrest.
22  Officer Craft testified that he knows of no way to edit or alter a videotape with his patrol
23  car's equipment. He further testified that he personally removed the videotape from his
24  patrol car's recording device, initialed and dated it, and that the videotape has been retained
25  in the Government's custody.

26  The Court did not find Defendant's testimony regarding omissions from the tape to
27  be credible. Defendant testified that Officer Craft first approached the driver's side of his
28  vehicle, had Defendant step out of the vehicle, and engaged in aggressive questioning, none

- 8 -

000000012

1  of which is shown on the tape.  The video tape shows Defendant's vehicle being pulled to

2  the side of the road, followed immediately by Officer Craft approaching the passenger's side

3  of the car and engaging in a conversation with Defendant and the vehicle's other occupant.

4  The videotape runs continuously throughout this event with the timer running continuously

5  as well.

6      Defendant testified that the tape does not show Officer Craft's initial opening and

7  search of the trunk, steps he allegedly took after withdrawing the keys from the automobile

8  and walking back to open and search the trunk by hand.  In fact, the videotape shows Officer

9  Craft opening the trunk later in the stop and examining the contents of the trunk for the first

10  time. He stands and scans the items in the trunk with his flashlight before beginning to move

11  the items on top. This would not be the conduct of an officer who previously had opened the

12  trunk and searched through the items as claimed by Defendant.

13      Defendant testified that Officer Craft asked him about food saver bags during a

14  segment that is not shown on the videotape. In fact, this question is shown on the videotape.

15  Similarly, Defendant testified that Officer Craft asked him about dryer sheets on the back

16  seat of the car at a point that is not shown on the videotape. This question is also shown on

17  the videotape. Thus, if Defendant's version is to be believed, Officer Craft would have asked

18  these questions twice and Defendant would have answered them twice, without any

19  indication in the second question or answer that the subject had already been discussed.

20      The Court finds Officer Craft's testimony about the integrity of the videotape credible

21  and Defendant's description of the omissions not credible.   The Court can find no

22  constitutional violation based on alteration of the videotape.

23      **IT IS HEREBY ORDERED** that Defendant Eric John Meisner's Motion to Dismiss

24  (Doc. #32) is **denied**.

25      DATED this 21st day of June, 2006.

The court did not rule on Manno's Supplemental Memorandum in support of Motion to suppress Docket text #46

David G. Campbell
United States District Judge

000000013